**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  23-cr-20377-BLOOM**

UNITED STATES OF AMERICA,

       **Plaintiff,**

vs.

 **JAMES TUCKER KORNHAUSER,**

       **Defendant.**

_____/

**DEFENDANT JAMES TUCKER KORNHAUSER'S**
**SENTENCING MEMORANDUM AND**
**REQUEST FOR NON-CUSTODIAL SENTENCE**

Defendant James Tucker Kornhauser, hereinafter "Tucker," by and through his undersigned defense attorney, Brett Schwartz, pursuant to 18 U.S.C. §§ 3553 and 3551, files this Sentencing Memorandum in support of his request for a reasonable sentence that is not greater than necessary to satisfy the statutory purposes of sentencing enumerated in 18 U.S.C. § 3553. Toward that end, a non-custodial sentence is respectfully requested. The objections to the guideline calculations proposed in the Pre-sentence Investigation Report ("PSR") are also contained within this Sentencing Memorandum.

1

## INTRODUCTION

As will be discussed in detail later in this Sentencing Memorandum, Tucker has a long, and well documented, history of severe mental health issues. Tucker respectfully requests a non-custodial sentence based upon his profound special needs and personal circumstances that will be thoroughly addressed in this Sentencing Memorandum, which is submitted to assist the Court to impose a just and fair sentence in this case. This Memorandum will demonstrate there are numerous factors to support a sentence well below the advisory guideline range for Tucker: 1) his lifelong severe mental health conditions; 2) his lack of criminal record; 3) his amenability to treatment; 4) his particularized vulnerability to abuse in prison; 5) his low risk of harm to others, 6) how well he is doing in treatment; 7) his extraordinary family support and 7) his low risk of recidivism. To that end, Tucker requests a sentence of time served followed by an extended period of supervised release, with any conditions the Court finds appropriate, including continued home confinement.

On March 6, 2024, Tucker entered a plea of guilty to possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2).  A conviction under 18 U.S.C. § 2252(a)(4)(B) carries a sentence of 0 to 20 years in prison and a term of supervised release of at least five years up to life.

Tucker is 32 years old. He was diagnosed early in his life with a litany of mental health conditions. He lives with his parents as a virtual recluse and has never been able to maintain employment.  He has no friends to socialize with and, for years, he has rarely left his

2

home.  He has been diagnosed with schizophrenia, generalized anxiety disorder, attention deficit hyperactivity disorder, obsessive compulsive disorder, and stimulant use disorder, in sustained remission. The cumulative effects of these diagnoses include, among other things, a lifelong lack of appropriate peer relationships, a lack of social or emotional reciprocity, and impairment of social awareness. His various compulsions make daily life very difficult to navigate so, instead, Tucker cocoons at home, all day, every day.

Not to minimize his conduct, but to differentiate his conduct from other offenders in terms of culpability, and considering his mental health conditions and other factors, we submit that Tucker's conduct was less egregious than the conduct generally exhibited by a defendant in a child pornography case. Tucker's mental disabilities contributed substantially to the commission of his offense. Tucker's offense conduct occurred over a very brief period.  He did not create or distribute child pornography to others, and he did not have any contact with a child.

Tucker has no criminal history. His PSR arrives at a Total Offense Level 31, resulting in an *advisory* guideline imprisonment range of 108 to 135 months.[1]  Nine to eleven and one-quarter years (9-11.25 years) imprisonment for a 32-year-old man who did not physically touch anyone, did not travel to meet anyone, and did not profit from this offense. Nor did he make any effort to do so. A sentence of nine to eleven and one-quarter years imprisonment for

_____

[1]   According to the USSC, "Sourcebook," Table 24, FYE 2023, 88.2% of 63,812 federal defendants sentenced that year fell below total offense level 31.

3

a man, who lives essentially as a recluse, and is diagnosed with severe mental impairment and possesses no real-life threat to anyone, is not just or reasonable.

Tucker has come to understand the seriousness of his conduct in this case.  He is aware he will be punished, subjected to an extended term of supervision, required to register as a sex offender, and face restrictions on where he may live, and who he may associate with, for the remainder of his life. In contrast, had Tucker been convicted of certain violent crimes such as Robbery (§ 2B3.1) or Arson (§ 2K1.4), he would not be facing any higher than the total offense level applied in his case.  As such, as serious as this offense is, the guidelines in this case ignore why we have had federal sentencing guidelines since 1987, and what has appeared in every Guidelines Manual since then.   In Chapter One - Introduction (3) The Basic Approach; "To understand the guidelines and their underlying rational, it is important to focus on the three objectives Congress sought to achieve in enacting the Sentencing Reform Act of 1984."   Those three objectives are to insure honesty, uniformity, and proportionality in sentencing. This remains truer in the post-*Booker* era.

## OBJECTIONS TO THE PSI

As to paragraphs 17 and 31 of the PSR, the probation officer states Tucker is accountable for 1,815 images depicting child pornography (CSAM). We would like to clarify that the 600 images described as child erotica do not qualify as CSAM images and should not be included in the total number of CSAM images, resulting in a reduction to 1,215 relevant images. Further, Assistant United States Attorney Audrey Pence Tomanelli (AUSA Tomanelli)

4

has advised that she will not be arguing for the 490 CSAM animation images to be included in the number of CSAM images for guideline calculation purposes since the number of images remains above 600. Tucker acknowledges the reduced number of images still exceeds the 600-image threshold needed to apply the 5-level increase; therefore, the advisory guideline range is not reduced, pursuant to § 2G2.2(b)(7)(D). However, for the Court's consideration, the number of applicable CSAM images under consideration is significantly reduced if the child erotica and animation images are removed from consideration.

As to paragraph 37 of the PSR, we object to the lack of reduction for acceptance of responsibility, pursuant to § 3E1.1.  AUSA Tomanelli has confirmed that she stands by the plea agreement, and she recommends that Tucker receive a three-level reduction for his acceptance of responsibility. Also, it's significant to note that the bond polygraph issue which is the basis for the probation office withholding the acceptance reduction, was pre-plea conduct. The conduct was acknowledged by the parties at the plea colloquy.  Neither party intended for it to impact Tucker's acceptance of responsibility. Should the Court agree with the parties on this issue, the Total Offense Level will be reduced to 28, resulting in an *advisory* guideline imprisonment range of 78 to 97 months.

Related to two specific offense characteristics contained at paragraphs 30 and 31 of the PSR, we ask the Court to recognize they are present in nearly every case and do not actually aggravate the charged offense. Paragraphs 30 and 31, respectively assigned enhancements for use of a computer or interactive computer service, pursuant to § 2G2.2(b)(6) and the offense

5

involving 600 or more images, pursuant to § 2G2.2(b)(7)(D). We assert that the calculations create a score higher than appropriate by adding enhancements that are inherent in the offense. See *United States v. Riley*, 655 F.Supp.2d 1298 (S.D. Fla. 2009). On this basis, we submit a downward variance is warranted, pursuant to 18 U.S.C. § 3553.

## LEGAL FRAMEWORK

After *United States v. Booker*,[2] district courts are no longer required to impose a Guidelines sentence. The Guidelines should still be "the starting point and the initial benchmark,"[3] but "district courts may impose sentences within statutory limits based on appropriate consideration of all the factors listed in [18 U.S.C.] § 3553(a)."[4] That statute provides:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and

---

[2] 543 U.S. 220 (2005).

[3] *Pepper v. United States*, 562 U.S. 476, 490 (2011) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)).

[4] *Id.*

6

       (D) to provide the defendant with needed educational or
vocational training, medical care, or other correctional treatment
in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence[s] and the sentencing range established for…the
applicable category of offense committed by the applicable category of
defendant as set forth in the guidelines…; (5) any pertinent policy
statement…issued by the Sentencing Commission…;
(6) the need to avoid unwarranted sentence disparities among defendants
with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

Pursuant to *U.S. v. Booker*, the federal sentencing process has adopted a three-step approach. (See Fed. R. Crim. P. 11(M), amended December 1, 2007, *U.S. v. Pugh*, 515 F. 3d 1179 (11th Cir. 2008), and Amendment 741 of the Sentencing Guidelines, effective November 1, 2010.)   First, the Court is to resolve any disputed guideline issues and determine the *advisory* guideline range. To that end, the PSR applies § 2G2.2, a base offense level 18, and numerous enhancements.   Should the Court resolve the objection related to acceptance of responsibility in Tucker's favor, the Total Offense Level will become 28, resulting in an *advisory* guideline range of 78 to 97 months.

Second, the Court is to consider if there are any factors that may warrant a departure from the *advisory* guideline range. At paragraph 109, the PSR suggests that the Court consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. We agree with this suggestion and believe such factors exist and will ask this Court to consider them as sentencing factors under 18

7

U.S.C. § 3553 in determining a *reasonable but not greater than necessary sentence in this case*.

Lastly, the Court is to consider all the sentencing factors of 18 U.S.C. § 3553(a) and impose a sentence which is "reasonable" and not greater than necessary to achieve the sentencing objectives set forth in 18 U.S.C. § 3553(a).  We believe there are factors for this Court to consider a sentence below the *advisory* guideline range.

### Trends In Child Pornography Cases

A number of Federal judges have testified in front of the U.S. Sentencing Commission that the child pornography guidelines are flawed because they did not result from painstaking empirical study and analysis, which was the Commission's mandate at its conception, but on legislative politics.  See, e.g., ABA Journal, June 1, 2009.  Over the past decade, Congress has repeatedly amended the child pornography guidelines without benefit of any scientific study on the part of the Sentencing Commission. "These guidelines are flawed not only because they are duplicative and draconian but most critically because they apply to almost all offenders, allowing no distinction between aggravated and less aggravated behavior." [Testimony of USDJ Joan Gottschall, before the Sentencing Commission].

In February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders. *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) ["*Child Porn Report*"]. This report to Congress on Federal Child Pornography Offenses complimented and expanded its

2009 History of the Child Pornography Guidelines, validated USDJ Gottschall's testimony. "Typical guideline penalty ranges and average sentences of imprisonment have increased since fiscal year 2004 in significant part because of: (1) a growth in the number and severity of enhancements following the PROTECT ACT amendments; and (2) an increase in the incidence of the underlying conduct and circumstances triggering such enhancements resulting from changes in typical offense conduct, particularly in the technology used, during the past decade. *Id.* at 123-25, 137-41, and 208-12. In particular, four of the six enhancements in § 2G2.2(b)----together accounting for 13 offense levels, now apply to the typical non-production offender. *Id.* at 209. The Commission concluded that "[t]he current sentencing scheme in§ 2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." *Id.* at xx; *see also id.* at 321.

On June 29, 2021, the United States Sentencing Commission published *Federal Sentencing of Child Pornography: Non-Production Offenses*, which updates and expands upon the Commission's 2012 *Report to the Congress: Federal Child Pornography Offenses*. In this 2021 report, the Commission provides data from fiscal year 2019. Related to Offense Characteristics, the 2019 data shows that conduct related enhancements are applied in a staggering percentage of cases. For fiscal year 2019, § 2G2.2(b)(6) (use of a computer) applied in 96.3% of possession cases; § 2G2.2(b)(7) (number of images table) applied in 95.4% of possession cases; and § 2G2.2(b)(2) (age of victims) applied in 96.3% of possession

9

cases.[5]   Thus, sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct and more culpable offenders now routinely apply to the vast majority of child pornography offenders. Section 2G2.2 contains a series of enhancements that have not kept pace with technological advancements. Additionally, at a minimum, Tucker will be held accountable for the equivalent of 1,215 images.  For that, he has been assessed a five-level enhancement, pursuant to § 2G2.2(b)(7)(D). Yet, the reality is that this number of images falls far below the median number of images present in possession cases during fiscal year 2019. In fiscal year 2019, non-production child pornography offenses (possession offenders) involved a median number of 2,350 images, with some offenders possessing and distributing millions of images and videos.[6]   Again, Tucker possessed the equivalent of 725 CSAM images, if the erotica and animation images are excluded. This number that falls far below the median, yet he received a five-level enhancement for his conduct. These figures demonstrate there is no proportional reasonableness to the guideline structure of § 2G2.2. In response, it appears courts increasingly apply downward variances in response to the high guideline ranges that apply to the typical non-production child pornography offender. In fiscal year 2019, the majority (59.0%) of non-production child pornography offenders received a variance below the guideline range cases.[7] This finding is further highlighted in the USSC "Sourcebook," FYE 2023, at Table 31, which reflects 62.9%

---

[5] See Page 19 (Table)

[6] See Page 30

[7] See Page 24

of 63,812 federal child pornography defendants sentenced received a downward departure or downward variance (excluding § 5K1.1 and § 5K3.1 early disposition cases).

### The Advisory Guidelines Are Not Entitled To Deference In This Case

Tucker acknowledges the serious nature of his conduct but contends that the advisory guideline imprisonment range in this case is not entitled to significant weight. When the Guidelines are not the result of "the Commission's exercise of its characteristic institutional role," such as when they are not based on an empirical approach, but are instead keyed to or guided by statutory directives, a court is not presented with the "ordinary case," in which "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough* 128 S. Ct. at 574; *see also Gall*, 128 S. Ct. at 594 n.2 (noting that not all Guidelines are tied to empirical evidence.) Thus, in cases involving application of Guidelines that do not exemplify the Commission's characteristic institutional role of careful study and empirical analysis, it is "not an abuse of discretion for a district court to conclude when sentencing a particular defendant" that application of the Guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes," even in an ordinary case. *Kimbrough*, 128 S. Ct. at 575.

Troy Stabenow published *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* 27-32 (Jan. 1, 2009). Stabenow notes that the current child pornography guidelines are not based on empirical data or the

sentencing expertise of the Sentencing Commission but are the result of arbitrary increases by Congress. In his conclusion, Stabenow states the following:

> The flaw with U.S.S.G. § 2G2.2 today is that the average defendant charts at the statutory maximum, regardless of Acceptance of Responsibility and Criminal History. As noted by the Guidelines Commission, there are "several specific offense characteristics which are expected to apply in almost every case (e.g. use of a computer, material involving children under 12 years of age, number of images."... The results are illogical... These results run contrary not only to Congressional will, but also to a principal Guideline policy-providing harsher penalties to individuals with more significant Criminal History scores while still retaining an incentive for pleas at all Criminal History levels.

The advisory guideline calculations included in the PSR in the instant case are the result of the infirmities and repetitive enhancements addressed by Stabenow. Thus, although Tucker acknowledges that the applicable guidelines constitute one of the factors contained in 18 U.S.C. § 3553(a), he contends that they are entitled to less weight than the other factors contained in the statute.

Consistent with Stabenow's conclusion, district courts around the country have imposed sentences far below the guideline range for offenses involving child pornography.  There is a dearth of examples for the Court's consideration.  A number are detailed as follows.

> *United States v. Benton*, 16-CR-00287-RAL-MAP (M.D. Fl. 2016) (granting a variance to probation for defendant convicted of possession of child pornography who had history of mental health disorders).

> *United States v. Tucker*, 11-CR-00252-Orl-28GJK (M.D. Fl. 2012) (granting a variance to a sentence of time served and 15 years of supervised release for defendant convicted of possession of child

pornography who had history of mental limitations and learning disabilities).

*United States v. Keskin*, 17-CR-077-RBD (M.D. Fl. 2017) (granting a variance to time served for defendant with Asperger's Syndrome).

*United States v. Carlsson*, 15-CR-200-B (M.D. Fla. 2016) (granting a variance to time served with ten years' supervised release for defendant with Asperger's Syndrome).

We believe a guideline sentence for this non-violent, first-time offender with significant mental health problems is unreasonable. In further support of our request for a non-custodial sentence, attached is a list of cases prepared by attorneys at the Federal Public Defenders of Eastern Washington. In each of the cases, which are organized chronologically, the defendant received a sentence of either probation or only days in custody for possession of child pornography charge.

## REASONABLE SENTENCE
## 18 U.S.C. § 3553(a) Analysis

Tucker understands that he broke the law and that he must be punished for his crime. However, in fashioning a reasonable sentence, this court must consider all the factors set forth in 18 U.S.C. § 3553(a).

### Nature, Circumstances, and Seriousness of the Offense

On November 13, 2019, agents completed a "knock and talk" at Tucker's residence. He answered the agent's questions, and his laptop was seized. 1,414 days later, on September 28, 2023, with no communication in-between, approximately 14 law enforcement agents

13

descended on Tucker's family home at 6:00 a.m. with bullhorns and machine guns. Tucker's mother, father and brother were also in the home at the time of the raid. They all were removed from the home and Tucker was arrested without incident. Later that same day, Tucker was released from custody after being granted bond and returned to the family home. He has remained under pretrial supervision since that time.

For reason's not related to Tucker, the investigation into the offense had stalled for years. It was not a continuing or complex investigation, it simply sat, for four years. In the intervening years, between the knock and talk in 2019 and his arrest in 2023, Tucker had no contact with law enforcement. He lived with his parents and rarely left his home and yard, not for any reason except that he prefers his universe small.  He does not like to leave the home in general.  Pre-arrest, he passed his time creating 3D computer art. Post-arrest, he passes time by listening to audiobooks.  He has no friends. The intervening years have shown increased mental health stability due to medication management and abstinence from stimulant drugs.

What the investigation ultimately demonstrated was that during a four-week period in 2019, four cyber-tips were received from the National Center for Missing and Exploited Children (NCMEC) related to four images of child sexual abuse material (CSAM) and Tucker's IP address. According to the government, forensic analysis of Tucker's computer and cellular telephone revealed images of child pornography. As previously discussed, the number of images involved in Tucker's offense falls well below average for offenders facing the same charge.

14

On March 6, 2024, Tucker plead guilty and affirmed his complete acceptance of responsibility for his involvement in this offense.  He signed both a written Plea Agreement and Factual Proffer, and he pled guilty. He pled guilty in this case, knowing the serious nature of the offense.  In short, Tucker has done all he could to quickly resolve his criminal liability in this case.

A defendant's genuine rehabilitation following commission of the offense can provide the basis for a downward variance. *See, e.g.*, *Gall*, 552 U.S. at 57. The criminal conduct in this case concluded nearly five years ago (2019). Since that time, Tucker has lived a quiet life in Savannah, GA with his supportive family. Together they manage his mental illness.

While numerous cases demonstrate a court's power to grant a substantial variance based on a defendant's rehabilitation, the Supreme Court's decision in *Pepper v. United States*, 562 U.S. 476 (2011), is particularly instructive in its discussion of the importance of considering events that transpire between the criminal conduct and the imposition of sentence. In *Pepper*, the Court held that evidence of a defendant's post-sentencing rehabilitation may support a downward variance at resentencing. *Id.* at 490–91. It went on to say that such evidence of rehabilitation "may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing," including the history and characteristics of defendant and the need for the sentence imposed to afford adequate deterrence, protect the public, and provide the defendant with needed treatment. *Id.* at 491.

15

Like the defendant in *Pepper*, Tucker has led a stable life, and has not committed new criminal conduct in the nearly five years since he committed the instant offense. He has achieved a degree of stability regarding his mental health conditions, virtually eliminating any chance for recidivism.

### History and Characteristics of James Tucker Kornhauser

### Tucker's History of Severe Personal and Familial Mental Health Problems

The PSR does a tremendous job in presenting a comprehensive history of Tucker's personal and familial struggles with mental health conditions.

Tucker's parents, Richard (Rick) and Kristie, have been married since 1987 and have three shared biological children, Tucker, Jesse, and Cullen. Richard has two additional daughters, Nicole and Natasha Kornhauser, from a prior marriage. The family tree on both sides of the family is rife with mental health and substance abuse struggles.

Richard Kornhauser suffers from depression.  He reported a family history of various mental health conditions and alcoholism.

Kristie Kornhauser has struggled with ADHD, depression, and anxiety since her teenage years.  She also reported a personal history of alcohol abuse. Kristie's brother committed suicide and various of her other family members suffer from ADHD, depression, schizophrenia, and dyslexia.

16

Jesse Kornhauser, Tucker's older brother, is a talented artist. As a teenager, he was diagnosed with anxiety, depression, attention deficit disorder. Jesse is also a heroin addict who has been clean and in recovery since 2015. He lives in the family home.

Cullen Kornhauser, Tucker's younger brother, began exhibiting mental health concerns as a child. He has been diagnosed with ADHD, depression, anxiety, and bi-polar disorder. He is currently stable and resides in Brooklyn, New York, where he is a student.

Richard and Kristie Kornhauser financially and emotionally support all three of their sons.

Tucker's struggles with crippling mental health disorders are lifelong and tragic. Few individuals will ever appear before the Court with equal or comparable disability. His history is so significant that the voluminous medical records are difficult to summarize. Simply put, it is difficult to select which events should be included in a summary for the Court.

Tucker's mother, Kristie, was asked to compile a chronological history so that the information could be shared with the Court and the probation office. She spent hours combing through materials and was able to reduce 28 years' worth of key events into the following timeline.

- **09/06/1991 -** Tucker was born in an emergency birth with meconium in his lungs. His first year+ he suffered from colic and persistent crying.

- **9/1994 -** Attends preschool, teachers advise he is far behind in speech. Subsequently evaluated and diagnosed with speech and language delay due to hearing issues. Enrolled in an immersive speech and language program with speech therapy for the remainder of preschool. At the end of two years in the program the faculty advised that Tucker had a processing issue. He has difficulty processing and retaining certain

17

information, e.g., he can't remember the days of the week and months of the year in order, he has trouble organizing his thoughts in a linear way. This processing issue has continued throughout Tucker's life.

- **1998/1999** – At age 7 or 8, we see the first signs that Tucker did not like to be touched or hugged, especially by men.  Tucker's parents eventually learned that Tucker had been sexually abused by an adult male in the neighborhood sometime in this period. There is research that shows an association between childhood abuse/trauma and later development of schizophrenia.  Delayed walking and speaking are also associated with later development of schizophrenia as are early separation anxiety and childhood night terrors, all of which Tucker did experience.   Over time, Tucker's difficulty in processing, difficulty in connecting with people on an emotional level, lack of critical thinking, worsened. Overtime, he would fall into isolated and autistic states during critical periods during decompensating episodes.

- **8/2000** – Family moved to Tennessee, Tucker started the 4th grade and continued with speech therapy.   During this period, he was diagnosed with a sinus issue that had impacted his hearing his whole life, which was then treated. He received speech therapy through the fifth grade.

- **2001/2002** - After his older brother was diagnosed with ADHD in 2001 or 2002, Tucker, his younger brother and mother were tested and diagnosed with ADHD. Tucker was not medicated for ADHD until approximately 6th or 7th grade (2003 or 2004).

- **2005** – At age 14, Tucker became depressed and his behavior changes, which we attributed to entering teen years - sullen, withdrawn, sad.

- **09/2006** - At age 15, Tucker had his first psychotic break.  Kristie was called from the school and told that he had a "break" (he was found without his clothes in a bathroom stall and did not know how he got there). Tucker was sent to a psychiatrist for that school year.   After testing, the psychiatrist recommended that he be put on Risperidone, but the doctor did not tell us that he thought Tucker was schizophrenic. Kristie researched the drug and it seemed a very heavy drug to put him on, with bad side effects; We thought his diagnosis was depression as we had not been given any diagnosis of schizophrenia, so we did not put him on the Risperidone.

- **2006-2007** - Tucker continued to be depressed through 2006 and 2007.  He had the school, and his friends call him by a different name -without our knowledge and dyed his blond hair black.   He made his first suicide attempt at this time by taking an

18

overdose of Sudafed.  We know now that some of the behaviors Tucker exhibited all through childhood are attributable to anxiety, but we did not recognize that at the time. By his teen years he began to exhibit marked outward signs of anxiety and compulsive behaviors that continue today.  Tucker also began "cutting" at this time. We believed all the excuses he had for why he had cuts.   In hindsight, we've learned that this behavior is an attempt to lessen anxiety and numbness and focus on physical pain rather than psychological pain.

- **8/2008** – Right before Tucker turned 17, the family moved to Providence, Rhode Island and Tucker began 11th grade.   The anxiety and OCD symptoms increased severely, we thought due to the move and a new school.  Although the OCD was not formally diagnosed until 2015, the compulsive behaviors were evident.  He began to constantly pace the floors if he was not engaged in an activity.  He would not let anyone touch anything in his room and the avoidance other people touching him became more pronounced.  He continued to take ADHD meds but has not yet been prescribed anti-depressants.  We later learned he had been experimenting with many kinds of street drugs (pot, LSD, etc).

- **2010** – Tucker graduated high school and went to college in Ohio, even though he had stated that he didn't want to attend college.  He began having what we now know were paranoid delusions as the untreated schizophrenia worsened.   He thought his roommate was spying on him and moving things around in the room so that the roommate could watch Tucker.   He failed out of the first semester and returned to Providence.

- **2011** - Tucker started therapy in Providence in with Jason Roderick, LCSW, and continued into early 2012.  He also started his first work experience at McDonalds as a fry cook.

- **2012** – Tucker continued his job at McDonalds, but after a few months it became increasingly hard for him to remember his schedule and he started missing shifts and lost the job. Notably, Tucker had gotten the job so he could save up money to go hike the Appalachian Trail.  However, he never practiced hiking, camping or trying to cook on a camp stove.  This was an example of the "grandiose thinking" that is a common symptom of schizophrenia, thinking you can do anything even if unprepared.  In April 2012, he went to Georgia to start the hike.  He lasted 3 days before he asked to come home. We later found out that the "noise/voices in his head" were present at the time.

- **2012** - Tucker begins community college in Providence in the summer and continues for the fall semester.

19

- **9/2013** – Tucker believes he can successfully go back to college. We wanted to believe too. In the fall of 2013, he enrolls in Northeastern University in Boston and lives in an apartment, as he was 22 and too old for the dorms. He also did not think he could deal with a roommate. His OCD symptoms were getting worse, but he thought he could continue with school. He was at Northeastern three semesters Fall 2013/Spring 2014 and Fall 2014. We did not realize how bad his symptoms had become and thought he was doing ok in school; however, he was not doing well at all.

- **2013** - Rick moves to NYC in September.

- **7/2014** - Kristie moves to NYC. Tucker begins another semester at Northeastern University.

- **12/2014 – 2015** - Tucker failed the fall semester at Northeastern University. The Dean of Students called to inform us that he had not attended class all semester. Tucker told us that his OCD was so bad that he could not leave his apartment. He had to perform multiple tasks and hand washing rituals before he could leave the apartment. He had phobias about other people's dirt although he lived in his own filth. He continued to be paranoid, thinking that people were watching and listening to him through his computer. He moves into the NYC apartment with us over Christmas break. He begins seeing a psychiatrist in NYC. The doctor put him on Seroquel, an antipsychotic, which made him feel "zombie like." It was at this time, we believe, that Tucker started experimenting with "research drugs." These were stimulant drugs that he hoped would quiet the "noise" in his head by allowing him to focus and not feel like a zombie. There is an online community that experiments with these drugs and reports on the effects. We thought he was acting stranger due to the Seroquel. He had uncontrolled body and facial/mouth movements that can be a side effect of Seroquel.

- **2016** -Rick moves to Miami Beach in February. Kristie and Tucker remain in the NYC apartment. Tucker continues seeing the psychiatrist, although he is resistant to therapy by not disclosing the full extent of his symptoms. He did not feel that the psychiatrist understood his issues. She prescribes other meds to try to get the right mix, but Tucker did not think they were helping, but he did not tell her that he heard voices, and they were getting worse. She suspected schizophrenia but did not tell us at this time as Tucker was an "adult."

- **2016** - In the spring 2016 when Tucker was about 25 years of age, he begins seeing Dr. James Bender at The Reeds Center in NYC to treat the OCD. Tucker participates in the aversion therapy which is conducted through Skype. Tucker is on a cocktail of

ADHD meds, anti-psychotics, and anti-depressants. He is still however, using the "research drugs." During this time, Tucker remains paranoid about people watching and listening to him. He believes that his therapy sessions with Dr. Bender are showing up on his brother's computer monitor. He was frequently awake for several days at a time and then would crash for a day. The cycle would begin again. He didn't remember what happened during these psychotic episodes. He OD's twice in the spring of 2016 from using the research drugs. After one of these, in tears, he tells me that he'd been anxious his entire life. He thought his father and I were always arguing about him. At the time I did not relate this to him hearing voices. The effects of the illicit drugs are getting worse. He does not tell anyone how bad the symptoms were. His belief that people were watching and listening to him through his computer intensified.

- **8/2016** - Tucker is incredibly paranoid and hearing loud and constant voices telling him to do bad things. Tucker continued to think that his private Skype sessions with Dr. Bender were showing up on his brother's computer. At one point, he had been awake for days, becoming more and more paranoid. He completely loses touch with reality the night of 8/9 - early morning 8/10. He is knocking on my bedroom door all night asking about the conversations I'm having, who else is in the apartment talking, etc. I tried to get him to go to the hospital at 4:00 AM. He refused to go to the hospital. He finally fell asleep for a short time after being awake for days. He thought the voices were narrating his every move and that his brother and I were talking about him. We learned later that the voices were malevolent, always yelling at him, telling him what to do and that he was a terrible person.

The psychosis continues to worsen. On Thursday morning while Tucker was sleeping, I called the psychiatrist to tell her what had been going on. She urged me to call 911 and he needed to be hospitalized. I called 911 while Tucker was sleeping, and the police arrived and then paramedics. Tucker was very angry, but they took him to the hospital. He was committed and spent 11 days in the psych ward.

Rick found a program in a hospital in Connecticut, Silver Hill Hospital, that accepted Tucker. It was a dual diagnosis program for people with substance abuse problems that are masking underlying psychiatric illnesses. He was there for 30 days and off illegal substances. This is when we received the formal diagnosis of schizophrenia from Dr. John Meyers, with which Dr. Dinstein and Dr. Bender concurred.

Testing by Dr. John Meyers in 2016 when Tucker was in the hospital, placed him in the 89/98 codetype: "This codetype suggests serious psychopathology; such persons feel inferior, inadequate and have low self-esteem, but at the same time are

disorganized and confused. They evidence hyperactivity, excitability, and disorientation. These individuals are highly over-ideational and spend a great deal of time in fantasy, daydreams, and rumination. They are tense and agitated, and insomnia is likely. They are highly distractible and have difficulties with attention and concentration. A psychosis may be present; physical symptoms of stress, especially GI and neurological symptoms may also be present. Suspiciousness and paranoia, and lapses into autistic-like episodes are typical. Often these persons exhibit a history of aspirations of high achievements, but mediocre actual attainment. Perceived failure is often the precipitating cause of a worsening of symptoms. Some are at risk for development of delusions and hallucinations. Mr. Kornhauser feels he has lost control of his cognitive processes because of alien, unbidden, and sometimes frightening thoughts and ideas that intrude upon and disrupt his thinking. Schizotypal features are strong, and Mr. Kornhauser is most likely schizotypal even when not frankly psychotic."

- **10/2016** - Two weeks after he got out of Silver Hill, Tucker and I moved to Miami Beach to join Rick. We found a new psychiatrist and he began treatment again. Despite the successful OCD treatment from the Reeds Center, Tucker relapsed, and the OCD symptoms began again in earnest. Not long after the move we realized he was still using the research drugs, ordered online and sent through the mail hidden in various things (I discovered later). His behavior was still erratic. We tried to keep him from using the "research drugs" by checking mail and confiscating them when found and withholding money from him, which did not always work.

- **2017** - Tucker developed a side effect to the Seroquel called pseudo tumor cerebri which caused hydrocephalus. He had a spinal tap in May 2017 to remove the fluid. He reported still hearing the "noise" in his head.

- **2018 - 2019** - Tucker is still hearing voices but does not tell anyone and he uses the research drugs whenever he can. During the summer of 2019, Tucker again began using the "research" drugs more frequently, becoming increasingly erratic and not sleeping for days, 5 or 6 days awake, again losing touch with reality. Again, he doesn't remember how he acted or what he did.

- **8/2019** - In August, Rick and I had to go away for five days for a family event. While we were away, our other son told us Tucker seemed psychotic and making strange non-verbal, guttural noises and making a lot of movement noise in his room. We returned home late in the evening, and it was clear Tucker had a complete psychotic break. He had completely torn up his room, his pillows, and his bed, looking for the

22

microphones that were listening and recording.  We took him to the hospital and had him Baker Acted.  He was in for five days and then came home.

Again, we were on the search for the cocktail of prescription drugs that would get him back under control. Tucker wanted to be treated as an adult and wanted to be in control of his medications so we agreed, but he would frequently forget to take them, couldn't remember if he had taken them and/or doubled dosed to catch-up.

Additionally, throughout his life Tucker has had gastrointestinal issues and he throws up almost daily.  He would throw up his medication quite frequently so we/he never knew how much of the oral anti-psychotic medication he was getting.  We think this contributed to his relapses.

After the August 2019, hospitalization, the psychiatrist enrolled him in a program to receive the anti-psychotic Abilify Maintena, a once-a-month injection.  He began this in November 2019.  It took a few months to regulate his symptoms.

- **11/13/2019** - We were visited by the FBI, which terrified Tucker and the rest of the family.  We were in the process of staging our house to put it on the market and we had movers taking out furniture and moving stuff around, it was very hectic.  We thought the FBI had made a mistake that would be cleared up.

- **2020** - In January, after a discussion with Tucker about him taking more responsibility at home, he attempted to end his life by taking 250 diphenhydramine pills.  We found him the next morning and he was taken to the ER. He was in the ICU for around a week and was Baker Acted again and was in the psych ward for a week.   Tucker remained very depressed.

- **3/2020** - Rick retired and we moved to Savannah, GA.  Tucker is still very depressed.  He began treatment through the Community Service Board, Gateway Behavioral Clinic.

- **5/2020** - On Memorial Day Weekend 2020, Tucker again attempts suicide. He was held in the ER for a few days until a bed opened in a psych hospital.  Tucker seemed to stabilize after this last psych ward episode.

- **2021** – Overtime, the Abilify Maintena has significantly lessened the overt "noise" in Tucker's head.  Despite moving to a new house in Savannah Tucker is stable.  He is not using the "research" drugs.   He complied with all doctor and injection appointments.   Tucker never learned to drive, he said it was too stressful, so I drive

23

him to all appointments.  He also does not like to fly or travel.  He does not leave the house—not even to go to a neighborhood gas station for cigarettes.

- **2022 - 9/2023** - Tucker seems stable as the Abilify injection provides a consistent and constant dose of anti-psychotic.  He is interacting more with the family.  Tucker teaches himself how to do 3D graphic videos and sound wave videos.  He connected with an online community that uses the software to do these videos and they help each other learn new techniques.  He improved significantly in proficiency in the software and posted his videos on YouTube.  He was sought out by a rep from an online digital art gallery and exhibited two videos in an online art show.  He continued to develop this skill.

- **9/28/2023** - The FBI arrested Tucker. This has contributed to an increase in anxiety. He is very depressed since he cannot make his 3D art on his computer.  Importantly, even with extreme anxiety/depression from the 9/28 event, he has not attempted suicide again, but he has clearly separated himself from us and stays largely in his room alone.

- **Current** - The Abilify injections seem to be lowering the voices, but Tucker remains depressed and very anxious. The OCD is still at a high-level. As always, he will not allow anyone to touch him, and he will not touch other people.  He keeps at least a three-foot buffer zone around himself, if someone is walking towards him, he will cross the room, so he won't come in contact with you.  He is always trying to anticipate which direction people are going to move. Even before his arrest, Tucker did not leave the house unless he had to for appointments.  When he does, he must take a shower as soon as he gets home to wash the "outside" dirt/germs off.

### Treatment History Congruent to Offense Conduct Time Period

A letter, dated April 16, 2024, was obtained from Dr. Jadiyer Acosta, Psychiatrist, with the Jay and Jeanie Schottenstein Center for Behavioral Health at Mount Sinai Medical Center, Miami Beach, Florida. Dr. Acosta confirmed Tucker was under his care between January 2019 and January 2020. During the treatment period, Tucker had the diagnosis of schizophrenia, a chronic mental disorder characterized by disorganized thought process and behavior, hallucinations, delusions, and negative symptoms like catatonia. It is important to note that

24

Tucker was experiencing an especially serious period of psychosis when he committed the instant offense. During this time, Dr. Acosta prescribed:

> Abilify Maintena, anti-psychotic, 400mg injection, 1x/month
> Buproprion, for anxiety/depression, 300mg, 1x/day
> Haloperidol, anti-psychotic, 3mg, 2x/day
> Atomoxetine, for ADHD/impulsiveness, 40mg, 1x/night
> Fluoxetine, for depression, 40mg, 1x/day

Additional documentation from Mount Sinai Medical Center, Miami Beach, reflects Tucker, between May 2017 and January 2020, received the following visit diagnoses:

- diaphragmatic hernia
- schizoaffective disorder
- schizophrenia
- obsessive-compulsive disorder
- low sodium levels
- drug intoxication with perceptual disturbance
- mental health problem
- dehydration
- prolonged Q-T interval on ECG
- drug dependance
- attention deficit hyperactivity disorder
- drug intoxication with complication
- altered mental state
- elevated transaminase measurement
- traumatic rhabdomyolysis
- leukocytosis, acute confusion
- water on the brain
- fall
- attempted suicide
- suicidal thoughts

An attachment is included with this filing which demonstrates the intersection of Tucker's psychotic crisis with the offense conduct in this case.

25

**Current Treatment Regimen**

Tucker is currently getting psychiatric care from Gateway Behavioral Health in Savannah, Georgia.  He has been under the care of Dr. Dupe Babalola since July 22, 2022. Dr. Babalola provided a letter, dated March 15, 2024, which outlines Tucker's diagnoses, medications, and treatment regimen.  The letter is reproduced as follows.

> Mr. Tucker Kornhauser is currently getting psychiatric care from Gateway BHCC. He has been under my care since 07/22/2022 and has continuously followed up with monthly appointments for med management/supportive therapy and monthly injections. His current diagnoses include Schizophrenia, Generalized Anxiety Disorder, stimulant use disorder; in sustained remission, ADHD, and OCD. His medications include Abilify Maintena, Depakote, Concerta, Prozac, Wellbutrin, Gabapentin and Ramelteon.
>
> Sincerely,
> Dupe Babalola, MD
> Gateway Behavioral Health – Savannah, Ga

The specific medications currently prescribed to Tucker include:

> Abilify Maintena anti-psychotic, 400mg injection, 1x/month
> Concerta, to increase focus, 36mg, 1x/day
> Depakote, for anxiety and OCD, 1500mg, 1x/day
> Buproprion, depression, 450mg, 1x/day
> Ramelteon, sleep, 8mg, 1x/night
> Fluoxetine, depression, 60mg, 1x/day

**Physical Health Condition**

It is important to note that Tucker has a number of medical conditions that add to the instability and frailty of his health. Tucker has chronic gastrointestinal conditions such as reflux (GERD) and a vomiting disorder.  The vomiting disorder is a significant factor in his

26

mental health stability in that Tucker must be able to ingest and digest his medications which, in turn, manage his mental health symptoms. The vomiting was a contributing factor in his medication induced (lack of) instability.  His treatment providers have successful transitioned Tucker to an injectable medication, Abilify Maintena, for its anti-psychotic benefits. The ability to administer this anti-psychotic medication in a fashion that guarantees absorption has been a life-altering development in stabilizing Tucker. It is important to note that Tucker did not receive his first injection of Abilify Maintena until October 26, 2019. This was the drug that ultimately helped stabilize his psychosis because it was an injectable that he could not expel from his body via vomiting. Again, the Abilify Maintena injections were started after Tucker was involved in the instant offense conduct. Notably, three weeks after Tucker received his first dose of Abilify Maintena, the FBI visited his home on November 13, 2019, related to the child sexual abuse material cybertips. Thus, Tucker was in a clinically unmanaged psychotic state while he committed the instant offense conduct (August & September 2019). It took months of the Abilify injections for Tucker to achieve a degree of stability.

Additionally, in 2017, Tucker a spontaneous allergic reaction to Seroquel which resulted in an accumulation of cerebrospinal fluid in his skull. The ability of his family to get him immediate medical attention was essential to his recovery.

27

## Tucker's Daily Life

From 2019 until his arrest for the instant offense, Tucker's only socialization, aside from family members, was with online art and design associates. He spent most of his time engaged in creating 3D computer art from his home. He developed a true talent and passed time creating art. This all changed when Tucker was arrested in 2023. Due to his involvement in the instant offense and the conditions of his pretrial release, Tucker is cut off from the only "community" he had, his online art and design associates. Since his arrest, Tucker's self-isolating behavior has worsened. Tucker is unable to work outside of the home due to his anxiety, compulsions, and phobias. Yet, he is prohibited from computer-related activities, thus, he cannot engage in the one activity that helped him pass time at home. It is clear, Tucker's life is one based in pervasive loneliness and inactivity.  Currently, to pass the time, Tucker immerses himself in listening to audiobooks most of his days. On a positive note, Tucker has strong family ties with his parents and siblings. They are fully aware of the offense conduct and remain unconditionally supportive.

## Forensic Psychological Evaluations

In November 2023, Michael Brannon, Psy.D. completed a forensic psychological evaluation on Tucker. Dr. Brannon was provided with significant collateral mental health documents in support of Tucker's lengthy mental health history (Silver Hills Hospital, Metropolitan Hospital, Mount Sinai Medical Center, The Reeds Center). The evaluation highlights Tucker's mental health history to include Schizophrenia, ADHD, Obsessive

28

Compulsive Disorder (OCD), anxiety, and depression. Further, the evaluation discusses Tucker's severe obsessions and compulsive behaviors as well as panic attacks, auditory hallucinations, and history of delusional beliefs, mostly involving paranoid themes. Also discussed was the fact that Tucker rarely leaves his home due to the debilitating effects of his severe mental health disorders.

Validity testing designed to assess for response distortion did not reveal any indications of poor effort or malingering. The evaluation concludes with the following DSM-5-TR Diagnoses: Schizoaffective Disorder with paranoid features, Obsessive-Compulsive Disorder, Attention Deficit/Hyperactivity Disorder, stimulant use disorder, cannabis use disorder, hallucinogen disorder, alcohol disorder. Dr. Brannon noted Tucker's mental health condition is fragile, he has been suicidal in the past on several occasions, and psychological testing revealed severe levels of hopelessness. Dr. Brannon advised that Tucker should remain in treatment that focuses on emotional regulation, medication compliance, anxiety reduction, goal setting, and relapse prevention. He should also be required to attend monthly psychiatric case management services and comply with all prescribed psychotropic medications. He should also participate in recovery group meetings and be monitored for suicidal ideations with placement into a psychiatric hospitalization for stabilization if clinically indicated.

In April 2024, Michael Brannon, Psy.D. completed a sex offender risk assessment with risk reduction strategies on Tucker. The comprehensive risk assessment included a polygraph

29

examination. Dr. Brannon reached the following conclusions. Based on an analysis of empirical risk factors for sexual reoffending for the C-PORT and STABLE-2007, it is the opinion of this examiner that the examinee poses a low risk of sexual reoffending in the foreseeable future. Polygraph testing did not reveal any indications of deception when the examinee reported that he had never engaged or attempted to engage in sexual contact with a juvenile. Psychological testing revealed indications of a thought disturbance, emotional distress, and somatic concerns. There were no indications of feigning mental illness on test Validity scales (see prior evaluation for additional testing information). In a telephone interview with the examinee's parents, they corroborated that their son has an extensive history of several mental health problems and a variety of psychological and psychiatric treatment interventions.

Research that was relied on for this analysis is contained in the C-PORT manual by Seto & Eke, 2015, and the United States Federal Sentencing Guidelines Commission (2012, 2021). In the most recent research by the United States Federal Sentencing Guidelines Commission (2021), child pornography offenders had an overall sexual recidivism rate of 4.3% over three years. Specifically, over three years, child pornography offenders were re-arrested for a contact sexual offense at a rate of 1.3% and for a non-contact sexual offense (child pornography) at a rate of 3.3%.

According to Dr. Brannon, if the current allegations are accurate as reported, the examinee would be an appropriate candidate for placement into weekly sexual offender

30

rehabilitation groups at a program such as REACH at the Clinical and Forensic Institute. He also would benefit from intensive outpatient treatment consisting of mental health and substance rehabilitation services at a program such as LifeSkills in Delray Beach Florida. He did not display any factors that would prevent him from benefitting from treatment services as outlined above. Research has revealed that sexual offender treatment has a modest yet significant effect on reducing rates of sexual reoffending.

<u>**Exceptional Vulnerability and Bureau of Prisons Issues Unique to Tucker**</u>

Pursuant to the most recent amendment (739) to §5H1.4, a defendant's physical condition, individually or in combination with other offender characteristics, such as age and the length of any expected sentence, may be considered as sentencing factors in fashioning a *reasonable but not greater than necessary sentence.* Even when the sentencing guidelines were mandatory, downward departures under § 5H1.4 were permissible. Because of his severe mental health disorders, his OCD, his phobias and all the associated behaviors, Tucker is exceptionally vulnerable to emotional and physical abuse. These factors put him at a high risk to be taken advantage of and/or abused in a correctional setting.

Further, the Bureau of Prisons encourages visiting by family, friends, and community groups to maintain the moral of the inmate and to develop closer relationships between the inmate and family members or others in the community" (see BOP p.s. 5267.07). However, defendants who violate child pornography statutes are barred from designation to a minimum-security camp, they are prohibited access to a computer and the Bureau of Prisons' Corrlinks

email system, they are not eligible for early release to a community confinement center, and they have difficulty finding any place to live as a registered sex offender. Pursuant to 18 U.S.C. § 3624(c)(1), generally, inmates serving a term of incarceration are to spend a portion of the final months (not to exceed 12 months), under conditions that will afford them a reasonable opportunity to adjust to and prepare for reentry of that prisoner into the community.   Again, this offense bars Tucker from this provision and the result is that any sentence imposed by this Court will have him serve up to 12 months more jail time than most other inmates.

It is also important to mention that Tucker's current degree of mental health stability is heavily dependent on the injectable anti-psychotic medication, Abilify Maintena. This medication is injected monthly at a cost of $2,900. Tucker's parents and care providers are very worried that he will not receive continuity of care if incarcerated. The Abilify Maintena has proven essential to his mental stability and if withheld, could result in severe regression into a psychotic state.

Tucker asks that his mental health disorders resulting in deficits in social and adaptive skills as well as his vulnerability be considered as sentencing factors under 18 U.S.C. § 3553 in fashioning a *reasonable and not greater than necessary sentence.*

### Family and Community Support

Tucker's parents are dedicated to his well-being.  They manage his care exceptionally well and to the best of their ability. Sadly, Tucker does not have relationships outside the family

home.  Thus, he does not have a friend, an employer, or an educator, who can write a character letter on his behalf. He does have family and friends of his family that can speak to the tremendous support Tucker has from his parents. Attached are three letters attesting to Tucker's exceptional family support.

<u>**Request For Imposition of a Downward Departure/Variance**</u>

Given the nature and circumstances of Tucker's offense and his extraordinary mental health condition, a non-custodial sentence is sufficient, but one not greater than necessary, to satisfy the purposes of sentencing and fulfill the intentions of Congress. For the reasons addressed in this Memorandum, a prison sentence is not necessary in this case to either promote respect for the law or to afford adequate deterrence to criminal conduct. Likewise, a prison sentence is not necessary under the circumstances of this case to protect the public from further crimes. It is important to highlight the fact that the government was not concerned about any danger that Tucker might pose to the community during the <u>1,414</u> days they allowed him to remain in the community without arrest after confirming he possessed child pornography images. It is significant for the Court to understand that Tucker, on his sentencing date, will have remained in the community <u>1,667</u> days post-knock and talk by agents. All that time, Tucker and his family have lived in a state of fear and worry.  The family has spent the four years since that event focused on managing and stabilizing Tucker's mental

33

health. They have been successful.  Tucker lives a quiet and solitary existence.  He is not a danger.  He will comply with any conditions set by the Court.

**<u>Suggested Community Based Treatment Plan</u>**

The United States Probation Office for the Southern District of Georgia contracts with Circle of Friends Counseling and Consulting in Savannah for sex offender treatment. Should Tucker be released to the community, a referral would be made to the Circle of Friends program to schedule an evaluation to develop a treatment plan that will likely include intensive outpatient therapy with a licensed counselor. Tucker's supplemental mental health treatment will continue as already established with Gateway Behavioral Heath in Savannah, Georgia. Efforts are also underway to determine if Tucker's family home in Georgia will be a permissible residential address for sex offender registration purposes.

An alternative treatment plan which encompasses a more intensive therapeutic setting has also been explored.  The program, Sanapia Community, based in Willis, Texas, specializes in residential treatment for clients with thought disorders, co-occurring disorders, and behavioral and/or sexual behavior histories.  The program would begin with 6-months of supervised-intensive residential treatment at Sanapia Community with treatment planning specific to Tucker's psychological/behavioral needs.  At the 6-month mark, the clinical team would evaluate Tucker's progress, general compliance with program and court requirements and present a recommendation which addresses the next step in his therapeutic plan.

34

The Sanapia Community residential treatment includes 24-hour staff supervision, boarding, meals, medication management assistance, intensive individual, and group therapy specific to clients with primary diagnoses, dual-diagnoses, intensive behavioral and or sexual behavior backgrounds. Additional to Sanapia Community's intensive residential intervention, is sexually specific intensive therapeutic services by Donica Jones, LPC-S, LSOTP-S, NC at her private practice: Houston Transitions to Wellness &Counseling. Following the 6-month residential treatment plan Tucker would likely be transitioned to 3-years of outpatient sexual behavioral treatment specific to Tucker's sexual specific behavior in accordance with Donica Jones, LPC-S, LSOTP-S, specific to her program's treatment model.

It is important to note that the above community-based treatment options would require the cooperation of the United States Probation Offices in the respective districts. There may be substantial supervision hurdles to overcome if Tucker attempts to temporarily relocate to Texas as a registered sex offender whose case originates in the Southern District of Florida. Returning Tucker to his home state of Georgia under home confinement with the requirement to participate in an intensive out-patient program may be the most feasible plan both logistically and personally for maintaining Tucker's long term mental health.

## CONCLUSION

Based upon the aforementioned factors, including the history and characteristics of Tucker Kornhauser, including his mental health conditions, his close relationship with and support of his family, his acceptance of responsibility, lack of criminal history, his

vulnerability if incarcerated, his low risk of recidivism and, his amenability to treatment, we respectfully request that the Court impose a sentence of time served and an extended term of supervised release, which is below the *advisory* guideline range after considering all the factors identified in this filing. This remains a substantial sentence.

Tucker is a convicted felon who will be a registered sex offender. He faces a long-term supervised release and a lifetime of reporting to the authorities as a sex offender pursuant to the Sex Offender Registration and Notification Act. 42 U.S.C. §§ 16901. The PSR and this Memorandum establish that Tucker has lived a life in which he has been crippled by the effects of his mental illness, leaving him dependent upon the support of his family, medical and psychological professionals, and the programs in which he is participating to enable him to interact with others and function, albeit minimally, in society.  In this case, the imposition of a home-based sentence would be sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

Counsel thanks this Court for considering our Response to the PSR and Sentencing Memorandum. Counsel will have further remarks at the time of sentencing.

36

Date: May 16, 2024                          Respectfully submitted,

                                            /s/ *Brett Schwartz*
                                            BRETT M. SCHWARTZ, ESQ.
                                            bschwartz@defendyourcase.com
                                            Florida Bar No. 150680
                                            HAGER & SCHWARTZ, P.A.
                                            110 SE 6th Street, Suite 1715
                                            Fort Lauderdale, FL 33301
                                            Telephone: (954) 533-3696
                                            Facsimile:  (888) 633-7595
                                            Attorney for Defendant/Kornhauser

<u>**SERVICE LIST**</u>

Audrey Pence Tomanelli, Esq.
audrey.pence.tomanelli@usdoj.gov
United States Attorney's Office

        I HEREBY CERTIFY that on the 16th day of May 2024, the undersigned
electronically filed the foregoing Sentencing Memorandum and Request for Non-Custodial
Sentence with the Clerk of Court using CM/ECF.

                                            /s/ *Brett Schwartz*
                                            BRETT M. SCHWARTZ, ESQ.